## Birosak *v.* Shawnee Inn et al., Appellants.

Argued June 12, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Raymond F. Lowery,* for appellants.

*Joseph P. Olexy,* for appellee.

OPINION BY ERVIN, J., September 13, 1962:

In this workmen's compensation case the referee, the board and the court below all agreed that the claim

should be allowed. The employer and its insurance carrier filed this appeal.

On August 18, 1955 Hurricane Diane struck the Pocono Mountain area and on August 19, 1955, as a result of the rains incident thereto, the premises of Shawnee Inn became flooded. The testimony clearly discloses that all of the housekeeping employees, including decedent, who was a houseman or porter with duties to clean and take care of the dining room, under the emergency conditions then prevailing, were engaged in carrying furnishings from the lower lobby or first floor to the main or second floor of the hotel. They continued in this task until the flood waters were up to their chins. When the waters receded on August 21 a number of the employees were engaged in cleaning up the mud, muck and debris of the flood. It is not at all clear whether the decedent helped in the clean up work. He expressed his intention in a letter to his wife, postmarked at Shawnee on August 22, 1955, to do so but he became ill and it is doubtful whether he did very much, if anything, in helping to clean the premises. He returned to his home in West Pittston, where his wife bathed his feet and legs, which were covered with mud up to his knees. On August 25, 1955 Dr. J. W. Testa began treating him and continued to do so until September 8, 1955, when he had him admitted to the hospital, where he died on September 10, 1955.

When the doctor first saw decedent he was running a high fever, had a cough and shortness of breath and he had rales in the base of the right lung. The doctor diagnosed his condition as lobar pneumonia of the right side of the lungs. The doctor testified that the decedent was progressing all right for awhile, his fever went down and then he began getting markedly short of breath and he began to note some swelling on the lower extremities. This indicated to the doctor that there was some cardiac disturbance. Dr. Testa saw the

decedent on August 25, 26, 27, 29, 31, September 3, 5 and 8, 1955. Dr. Testa did not see the decedent when he was in the hospital. Dr. Testa testified as follows: "Q. Doctor, what is your opinion as to the cause of death? A. I don't think it was coronary heart disease. I think it was the effect of the pneumonia. The heart was—the pneumonia he had, the heart was damaged and finally he got heart failure. Q. So, he died of a heart failure, then, in your opinion, which resulted from the strain put on it by the pneumonia? A. Yes, sir." He also testified that it was his opinion that he contracted the pneumonia as a result of his exposure at the Shawnee Inn, his exact language being, "Well, due to the exposure and being wet and so on and he contracted it in that manner."

Dr. Testa was the only doctor who testified in person. Part of the hospital record was read into the evidence by agreement. It showed the patient was admitted on September 8, 1955 and died on September 10, 1955 and that the attending physician was Dr. Cotter. It showed a diagnosis of "(1) Coronary Heart Disease. (2) Anthraco-silicosis, stage three." It was stated in the history that "Patient has had for a considerable period, gradually increasing shortness of breath. During the recent flood near Stroudsburg, Penna. patient suffered great hardship and exposure to inclement weather and the shortness of breath was greatly increased, accompanied by severe pain in chest. When these symptoms became intense, patient was referred to Medical Service for treatment. Past History: No serious illnesses or injuries. Worked in coal mines many years." There is a note in the record by Dr. Cotter under date of September 9, 1955, as follows: ". . . condition does not warrant trip to X-ray Department."

At most this would be a conflict of medical opinion concerning the cause of death. The referee and the board chose to accept the opinion of Dr. Testa, who

attended the decedent from August 25 to September 8, a period of 14 days, before his admission to the hospital, rather than the doctor who saw him for a day or so when he was in the hospital. This was the board's privilege. The credibility to be accorded the witnesses and the weight to be given to their testimony is for them: *Erwin v. L. & H. Construction Co.*, 192 Pa. Superior Ct. 632, 634, 635, 161 A. 2d 639; *Shoemaker v. Budd Company*, 193 Pa. Superior Ct. 95, 163 A. 2d 680.

The referee made, inter alia, the following findings: "6. As the flood waters began to cover the grounds, the employees, including the decedent, removed furniture and furnishings from the first floor to the second floor. They continued to do this until the water on the first floor was up to their chins.

"7. On the night of August 19, 1955, because of the rising flood and continuing rain, the decedent left the dormitory and spent the night on a nearby hill.

"8. The flood receded on August 21, 1955. All available employees, including the decedent, proceeded to shovel out the mud which had accumulated to a depth of about two feet on the first floor of the hotel and on the grounds surrounding the hotel. The hotel was cleared of mud on August 24, 1955.

". . .

"10. On September 8, 1955, the decedent was admitted to the Pittston Hospital. He died there on September 10, 1955. The cause of death was heart failure, secondary to pneumonia.

"11. The decedent contracted the pneumonia as a result of unusual exposure, during the Hurricane Diane in the regular course of his employment with the defendant.

"12. The decedent was in good health prior to his exposure during the hurricane."

The board, after referring to the evidence concerning the flood and rain and the decedent's exposure to

them, said: "After a careful review of the entire testimony, we are of the opinion that this case represents the sort of extraordinary exposure which necessitated impulsive action on the part of the employee to protect the property of the employer, and that as such constitutes an accident within the meaning of the Act as set forth in the cases cited."

The principal contention of the appellants is that there was no accident or injury as that term has been construed in decisions interpreting the provisions of the Workmen's Compensation Act. They cite in support of their contention *Parks v. Miller Printing Machine Co.*, 336 Pa. 455, 9 A. 2d 742; *Boyer v. Aluminum Co. of America*, 145 Pa. Superior Ct. 307, 21 A. 2d 135; *Decker v. Perfection Laundry*, 151 Pa. Superior Ct. 94, 29 A. 2d 429.

In answer to these cases we quote with approval what was so well said by Judge LEWIS for the court below: "In each of the first two cases claimant's decedent calculatedly exposed himself to the conditions which resulted in death, *following* a flood. *In neither was the decedent subject to emergency conditions incident to the flood itself*. The third cited case, as we construe it, contains a factual situation wherein an employee, in the regular course of her employment, deliberately exposed herself to a draft which resulted in illness."

The present case is covered by the ruling announced in *Jones v. Phila. & Reading C. & I. Co.*, 285 Pa. 317, 132 A. 122, at page 320, in the following language: "Injury following an extraordinary exposure to wet and cold, suffered in the course of employment, may be compensable under the workmen's compensation statutes, on the same principle as a prostration resulting from heat (Lane v. Horn & Hardart Baking Co., 261 Pa. 329); so may death from pneumonia caused by an injury or unusual exertion and exposure: Dumbluskey v. P. & R. C. & I. Co., 270 Pa. 22; Murdock v. New York

News Bureau et al., 263 Pa. 502; Bradbury's Workmen's Compensation (3d ed.), beginning at page 424; also In re McPhee, 109 N.E. (Mass.) 633."

The present case also falls within the third class of cases described by Justice (later Chief Justice) STERN, in *Parks v. Miller Printing Machine Co.*, supra, at page 460, in the following language: "The third group, more indefinite but nevertheless well established, is where the exposure is, from a technical standpoint, voluntary, and the resulting pneumonia or similar disease reasonably foreseeable, but where the 'accident' consists of an unusual and suddenly developing concatenation of circumstances which necessitates impulsive rather than deliberate action and under conditions markedly different from those attendant upon the usual course of the employe's regular work. For example, a workman was suddenly called upon to attempt a rescue of his father who had been buried by the slide of a culm bank; the effort lasted about $2\frac{1}{2}$ hours; a large quantity of water was used in the rescue work and the employe was drenched from his knees down; the result of this exposure was a cold which later took the form of pneumonia. The act thus performed by the employe was voluntary and under conditions from which a resulting pneumonia might readily have been anticipated, but compensation was allowed because of the extraordinary circumstances which demanded prompt action on the part of the employe under unusual and exceptionally unfavorable conditions (Jones v. Philadelphia & Reading Coal & Iron Co., 285 Pa. 317)." The evidence in the present case clearly reveals that there was "an unusual and suddenly developing concatenation of circumstances which necessitates impulsive rather than deliberate action and under conditions markedly different from those attendant upon the usual course of the employe's regular work."

Herman Reidiger, who was the chief witness for the defense and who was the maitre d'hotel at the Shawnee Inn, testified as follows: "Q. Now, calling your attention to August of 1955, did anything unusual happen during the month of August at the Shawnee Inn? A. Oh, yes. The thing is this, this is about the flood? Q. There was a flood during that time? A. A flash flood." His testimony also clearly reveals that the flash-flood surprised a lot of people and was not expected. He testified that on the 17th and 18th no special provisions were being made by the people at the Inn. He also testified that this was only the second or third time in 30 years that they had had a flood at the Inn and that there wasn't any advance warning of a day or two that they were going to have a flood. It was not until the morning of the flood at some time between 8:30 and 9:00 that they suddenly decided to move the furniture, mattresses, bedding, linens, etc. from the first floor to the second. His testimony was as follows: "Q. When did you decide to do that, when you yourself saw the water rising? A. Yes, I would say it may have been about 9:00 or 9:30 that morning."

The flood crested on August 19, 1955 to a point within a few inches of the main or second floor of the hotel. All available employees were hurriedly pressed into service and worked until the water was up to their chins.

It is our opinion that this case clearly falls within the unusual and suddenly developing concatenation of circumstances which necessitated impulsive rather than deliberate action. This emergency task was markedly different from the usual work performed by the decedent. His regular work was to dust and clean the dining room.

Counsel for appellants also make much of the fact that the referee found the accidental injury was due not only to the activities of August 19, 1955 but also

to the activities the decedent engaged in for several days thereafter. The core of the board's opinion is found in the following language: "After a careful review of the entire testimony, we are of the opinion that this case represents the sort of extraordinary exposure which necessitated impulsive action on the part of the employee to protect the property of the employer, and that as such constitutes an accident within the meaning of the Act as set forth in the cases cited." Undoubtedly the board was referring primarily to the activities which occurred when the flood waters were rising. That is when the impulsive action had to be taken to protect the employer's property from damage by moving it from the first floor to the second floor. That is when the employees were in water up to their chins. There is considerable doubt whether the decedent took any major part in the clean up operation. There is no doubt, after a reading of this record, that the decedent did take part in helping to move the property from the first floor to the second floor when the flood waters were rising. In this connection it must be remembered that the evidence must be construed most favorably to the party prevailing before the board and all reasonable inferences will be drawn in support of the findings in his favor: *Lawrence v. Delmont Fuel Co.,* 193 Pa. Superior Ct. 65, 163 A. 2d 684. It is for the referee and the board, not the courts, to determine the weight of circumstantial evidence: *Kline v. Kiehl,* 157 Pa. Superior Ct. 392, 43 A. 2d 616. Gwen Smith testified that the flood began entering the hotel at 7:30 a.m. on the 19th; that she left late in the afternoon; that the decedent was still working there and that everyone was still helping to move linen and furniture from the flooded floor to the upper floor. Albert Kokas testified that he saw decedent in the hotel as the water was rising and ate with him; that everybody helped to move things from the first floor to the second; that everybody

worked until the water came up to their chins at about 11:00 a.m.; that no one left the building until about 6:00 p.m. In a letter written to his wife on August 20, 1955, the decedent stated: ". . . the hotel was half way in water but we were still working in it. . . ."

Order affirmed.